# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8066 | **DATE** | 6/5/2001 |
| **CASE TITLE** | Candida Martinez vs. U-Haul Company of Illinois, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant U-Haul's motion for summary judgment (Doc. No. 77) is granted as to Plaintiff's sexual harassment count and defamation count and denied as to Plaintiff's retaliation claim. Defendant U-Haul's motion to file certain summary judgment papers under seal (Doc. Nos. 79, 103) is denied. Defendant Arlester Webster's motion for summary judgment on Plaintiff's defamation count (Doc. No. 75) is also granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | 3 number of notices | |
| ✓ | Notices mailed by judge's staff. | JUN 0 6 2001 date docketed | |
| | Notified counsel by telephone. | | 105 |
| | Docketing to mail notices. | 6/5/2001 | |
| | Mail AO 450 form. | date mailed notice | |
| | Copy to judge/magistrate judge. | | |
| ETV | courtroom deputy's initials | ETV mailing deputy initials | |

FILED FOR DOCKETING
ED-7
01 JUN -5 PM 4: 48

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JUN 0 6 2001

CANDIDA MARTINEZ, )
)
Plaintiff, )
)
v. ) No. 99 C 8066
)
U-HAUL COMPANY OF )
ILLINOIS, INC. )
an Illinois corporation and ) Judge Rebecca R. Pallmeyer
ARLESTER WEBSTER )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Candida Martinez brings this action against her former employer,

Defendant U-Haul Company of Illinois, Inc. ("U-Haul") and her former supervisor,

Defendant Arlester Webster ("Webster"), alleging that Webster sexually harassed her

and, after she complained about the harassment, retaliated against her in violation of

Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff brings a state law

claim for defamation against both Defendants, contending that after she left U-Haul,

Webster falsely told several prospective employers that Plaintiff was a thief.[1]

Defendant U-Haul now moves for summary judgment, contending Plaintiff has not

---

[1] Plaintiff's complaint also contained a count of intentional infliction of emotional distress against both Defendants and an assault and battery count directly against Webster. This court dismissed Plaintiff's intentional infliction of emotional distress claim against U-Haul on May 18, 2000 and against Webster on January 9, 2001. Because Webster has not moved for summary judgment on the assault and battery claim, that claim will not be addressed in this opinion.

1

established that she suffered severe and pervasive harassment, nor has she established a prima facie case of retaliation. In addition, both Defendant U-Haul and Defendant Webster seek summary judgment on Plaintiff's defamation claim, arguing that Plaintiff has not proffered any admissible evidence to sustain this count. For the following reasons, Defendant U-Haul's motion for summary judgment is denied in part and granted in part, and Defendant Webster's motion for summary judgment is granted.

## FACTUAL BACKGROUND

### A.    Plaintiff's Employment at U-Haul

Plaintiff was employed at the U-Haul moving center in Park Forest, Illinois, as a customer service representative from late 1997 until January 1998 and then again from August 1998 until she quit her job in May 1999. (U-Haul Co. of Illinois' Rule 56.1 Statement of Uncontested Facts (hereinafter "Def.'s 56.1 Statement") ¶¶ 1, 30.) From August 1998 until May 1999, Defendant Arlester Webster was Plaintiff's supervisor. (*Id.* ¶ 3.)

Plaintiff's job duties as customer service representative included: (1) assisting with retail, taking reservations, and selling items out of the store; (2) light cleanup, including mopping and sweeping the storage area; (3) "trailer hookup" – consisting of hooking dollies up to the cars or trucks; and (4) displaying storage areas to customers. (Pl.'s Dep., at 35-37.) From early 1999 until she left U-Haul, Plaintiff was the only full-time customer service representative at the Park Forest facility. (Def.'s 56.1 Statement ¶ 36.)

On the day Plaintiff was hired at the Park Forest facility, she received a publication entitled "Welcome Aboard" which, among other things, describes U-Haul's sexual harassment policy. (Def.'s 56.1 Statement ¶¶ 10, 12.) That publication instructs employees who feel they have been sexually harassed to report these incidents and identifies a variety of avenues for reporting any perceived harassment. (*Id.* ¶ 11.) Additionally, to educate employees about this policy, U-Haul provides its managers with a policy bulletin that contains more written information concerning sexual harassment. (*Id.* ¶ 17.) That bulletin includes such information as a definition of sexual harassment, a set of procedures for responding to and investigating complaints of sexual harassment, suggested corrective actions that may be taken in response to such complaints, and other guidelines for conducting investigations. (*Id.* ¶ 18.) The bulletin also notes that the EEO and Human Resources staff at U-Haul are available to provide guidance regarding sexual harassment. (*Id.* ¶ 19.) Attached to that bulletin is another internal publication of U-Haul's Policy prohibiting sexual harassment. (*Id.* ¶ 21.) According to U-Haul, a copy of this policy is posted at every U-Haul moving center, and identifies the person(s) to whom an employee is to report any incidents of harassment. (*Id.* ¶¶ 13, 14.) Plaintiff denies that any such policy was posted at the moving center where she worked, but she admits that she herself had a copy of the policy and, further, admits that she had the toll free number to call to report incidents of sexual harassment. (Plaintiff's Response to U-Haul Co. of Illinois Rule 56.1 Statement of Uncontested Facts (hereinafter "Pl.'s 56.1 Response") ¶¶ 13, 16,

41.)

## B.    Alleged Incidents of Sexual Harassment

Plaintiff testified that while Webster was her supervisor, he asked her out on dates "just about every day." (Pl.'s Dep., at 80, 95.)  She also claims that other employees, including Donald Williams, Torino Terry, Vivian Shegog, and Greg Flores, witnessed Webster acting flirtatiously with her. (*Id.* at 160-162.)  Plaintiff contends that Webster did not treat other employees this way. (*Id.*)  She admits, however, that she did not complain to U-Haul about Webster acting flirtatiously towards her and also admits that his flirtatious behavior bothered her only "sometimes." (*Id.* at 162.)  Additionally, she testified that she did not consider Webster's requests for dates to be sexual harassment, nor did those requests bother her. (*Id.* at 80, 95.)

Along with the requests for dates and the flirtatious behavior, Plaintiff alleges that Webster improperly touched her at work on two separate occasions.  The first such incident occurred in late January 1999 at a time when Plaintiff and Webster were alone in the store. (Pl.'s Dep., at 67-68, 72.)  According to Plaintiff, she was standing at the store counter counting her receipts when Webster came up behind her and put his hands on her upper thighs, a little below the waist line, and rubbed there, above the clothing, for about 30 seconds. (*Id.* at 67-69, 70.)  Because he came up from behind her, she did not know at first that it was Webster who was touching her. (*Id.* at 70.)  When Plaintiff turned her head and saw that it was Webster, she told him, "Don't touch me," and he walked away. (*Id.* at 69-71.)  Plaintiff went home immediately after

the incident. (*Id.* at 73.)

The second such incident occurred a month or so later, sometime in late February 1999. (*Id.* at 75.) Again, Plaintiff was at the counter counting her receipts when Webster came up behind her and put his hands in her front pockets and began to rub her thighs for about five seconds, until Plaintiff hit him in the stomach and he walked away. (*Id.* at 75-77.) As with the first such incident, there were no other workers or customers in the store at the time. (*Id.* at 77.) Plaintiff contends that she went home directly after the incident and told her mother what happened. (*Id.* at 78-79.)

Defendant tells a very different version of his treatment of Plaintiff and of the two alleged incidents of touching. According to Webster, he never rubbed Plaintiff's thighs in either incident, but merely removed a set of keys from her back pocket on two occasions. (Webster Dep., at 69.) As he explained it, the first time this occurred, he asked Plaintiff for the cash drawer keys so he could ring up a customer and give him his change. (*Id.* at 72.) Plaintiff was eating lunch at the time and she turned to indicate he should just take the key from her back pocket. (*Id.* at 104.) He then grabbed the portion of the key ring that was sticking out of her pocket and, therefore, never had to reach into her pocket or touch her person. (*Id.* at 74-75.) According to Webster, the second incident occurred in much the same way; Plaintiff gave him permission to take the keys out of her pocket and he took them out without touching her body. (Def.'s 56.1 Statement ¶ 57.)

5

On March 11, 1999, Webster was arrested for the second touching incident after Plaintiff's uncle, Andre Martinez, called the police about the matter. (Pl.'s Dep., at 145.)[2] Plaintiff points out that, at this time, Webster signed a written statement in which he stated, in relevant part, "I put my hand in [Plaintiff's] pocket just as a joke, she got mad, I pulled it out and left her alone." (Pl.'s 56.1 Additional Facts ¶ 17.) Webster asserts, however, that he did not read over the statement before he signed it and specifically denies that he told the police he put his hands in Plaintiff's pockets. (Webster Dep,. at 142-45.)

Plaintiff herself did not testify to any other incidents of touching or any other harassing behavior by Webster. Plaintiff's cousin, Vivian Shegog, however, who worked with Plaintiff and Webster at the same U-Haul moving center, testified to a number of incidents in which she claims to have observed Webster harassing Plaintiff. (Plaintiff's Rule 56.1(b) Additional Statement of Contested Facts (hereinafter "Pl.'s 56.1 Additional Facts") ¶¶ 6-14.) For example, Shegog testified that on several occasions, she witnessed Webster attempt to reach around Plaintiff and, while reaching, he would "[pat] her up." (Shegog Dep., at 22; Pl.'s 56.1 Additional Facts ¶ 6.) She also saw Webster go out of his way on a daily basis to brush up against Plaintiff. (Shegog Dep., at 43; Pl.'s 56.1 Additional Facts ¶ 7.) She named several additional occasions, apart from the two incidents Plaintiff related, where Webster touched Plaintiff. (*Id.* ¶ 10.) She also testified that she saw Webster stare at Plaintiff, and if Plaintiff bent over,

---

[2]     Plaintiff testified that she did not know whether Webster was eventually charged with any criminal conduct. (Pl.'s Dep., at 149.)

heard him make comments about her. (*Id.* ¶ 12.) On several of the occasions when Webster touched Plaintiff or moved close to her, Shegog witnessed Plaintiff push Webster away, kick him, make facial expressions at him and ask him directly, "what are you looking for?" (*Id.* ¶¶ 25-28, 31.) Shegog testified that Plaintiff told her that this behavior bothered her and Shegog recalled that, at one point, Plaintiff was on the brink of tears as a result of these incidents. (Shegog Dep., at 78.)

Defendant U-Haul points out, however, that Plaintiff herself admitted that there were only two instances of physical contact with Webster. (Def.'s 56.1 Response ¶ 6.) In addition, Plaintiff did not testify to any of the events that Shegog related and, in fact, testified that Webster never made any comments about her anatomy. (*Id.* ¶ 12; Pl.'s Dep. at 213.)

## C.    U-Haul's Investigation of Plaintiff's Complaint

On February 23, 1999, shortly after the second incident of touching had occurred, Plaintiff called the 800 number listed in her "Welcome Aboard" book to report the perceived sexual harassment and spoke to Jim Cody at U-Haul International's Human Resources Department in Phoenix. (Def.'s 56.1 Statement ¶ 45; Pl.'s Dep. at 64, 96.)[3] She told Cody that on two separate occasions Webster had come up behind her and touched her thighs with his hands. (*Id.* at 65-67.) She also told him that Webster continually asked her out on dates. (Def.'s 56.1 Statement ¶ 46.) After

---

[3]    Plaintiff actually says that she first called the 800 number during the first week of March 1999. (Pl.'s Dep., at 63.) Because Defendant itself claims she called the number even earlier (and, therefore, closer to the incident of harassment), for the sake of this motion the court will assume Plaintiff made the call on February 23, 1999.

her call, U-Haul International's Human Resources Department informed U-Haul Marketing Company President Chris McDermott of Plaintiff's complaint. (*Id.* ¶ 48.) Two days later, on February 25, 1999, McDermott went to the Park Forest facility to investigate. (*Id.* ¶ 49.)

Plaintiff and Defendant dispute whether McDermott followed U-Haul's guidelines for conducting a proper sexual harassment investigation. (Def.'s 56.1 Statement ¶ 50; Pl.'s Response ¶ 50.) According to Defendant, McDermott began his investigation by interviewing Plaintiff to determine the details of her complaint, at which point Plaintiff reiterated what she had reported in her call to the 800 number: that Webster had asked her out on dates and had, on two occasions, touched her. (Def.'s 56.1 Statement ¶¶ 51, 52.) According to McDermott, Plaintiff said Webster had been taking keys from her back pocket on those occasions and Webster admitted that he had in fact removed keys from her back pocket on two occasions, but said he had done so only with Plaintiff's permission and without touching her body. (*Id.* ¶¶ 52, 57.)

McDermott said he interviewed everyone on the active payroll at the Park Forest facility during the relevant time frame. (Def.'s 56.1 Statement ¶ 54.) This included Webster and a number of Plaintiff's co-workers: Julie Solis, Jovan Blount, Darney Rife and Torino Terry (who is Plaintiff's boyfriend). (*Id.* ¶ 54.) McDermott did not interview Plaintiff's cousin Vivian Shegog because she was on a short medical leave of absence during the time of the incidents of touching. (Def.'s 56.1 Response ¶ 101.) McDermott determined that none of Plaintiff's co-workers had seen the incidents of touching of which Plaintiff complained. (Def.'s 56.1 Statement ¶ 56.)

Plaintiff denied that McDermott began his investigation by interviewing her. (Pl.'s Response ¶ 51.) Instead, she claims that he started the investigation by interviewing her co-workers Jovan Blount, Julie Solis, and Darney Rife. (*Id.*) She also contends that McDermott never interviewed Torino Terry and that, though Shegog was on a leave of absence, there was no reason not to interview her. (*Id.* ¶¶ 50, 55.) Additionally, Plaintiff points out that no one was present for the two incidents of touching that she complained of, so none of the witnesses would have seen these contacts. (*Id.* ¶ 56.)

McDermott concluded his investigation on March 4, 1999. (Def.'s 56.1 Statement ¶ 60.) He concluded that Webster had removed keys from Plaintiff's pocket by taking the key ring and not by touching her thighs. (*Id.* ¶ 61.) McDermott then met with Plaintiff and Webster. (*Id.* ¶ 63.) According to McDermott, Plaintiff admitted at that meeting that Webster had asked for the key and she had turned her hip and back pocket toward Webster and indicated that he should take the key because she was eating lunch and her hands had food on them. (*Id.*) McDermott also said that he found no corroboration for Plaintiff's claim that Webster had asked her out on a date. (*Id.* ¶ 64.) Finally, McDermott explained that he asked Plaintiff whether she wanted him to transfer Webster or herself but she did not request that either be transferred. (*Id.* ¶ 66.) Plaintiff testified that she felt Webster should be terminated from his employment at U-Haul, but admits that she did not request that either she or Webster be transferred. (Pl.'s Dep., at 91.)

Based on McDermott's investigation, U-Haul issued a written warning notice to Webster on March 4, 1999, informing him that any future inappropriate comments or actions would subject him to immediate termination. (Def.'s 56.1 Statement ¶ 67.) Webster reviewed and signed the notice. (*Id.* ¶ 68.) It is undisputed that after this incident, Webster never again touched Plaintiff, asked her for dates, or acted flirtatiously toward her. (*Id.* ¶ 72.) Plaintiff, however, felt that a written reprimand was not sufficient, and so in March of 1999 she once again called U-Haul's 800 number and spoke to an employee in Phoenix named Cary Kirkland. (Pl.'s Dep., at 90-91.)[4] Kirkland failed to get back in touch with Plaintiff. (*Id.*) Plaintiff then filed a charge of discrimination with the Equal Employment Opportunity Commission on April 9, 1999. (Def.'s 56.1 Statement ¶ 85.)

### D. Plaintiff's Retaliation Claim

Plaintiff admits that Webster did not touch her again once she complained about the harassment, but she claims that Webster retaliated against her in a number of ways for complaining about him. To begin with, Plaintiff testified that from the moment she called Jim Cody, Webster imposed harsher job duties on her than he imposed on other similarly situated employees. (Pl.'s Dep., at 43, 86.)[5] As she explained, Webster made her job harder by "pil[ing] on more work" and changing her

---

[4]    Plaintiff was unsure as to Kirkland's official job title. (Pl.'s Dep., at 91.)

[5]    Plaintiff testified that the day after she called Cody "everybody" at work knew that she had called him and everyone was talking about it. (*Id.* at 86.) Because she did not tell anyone about the phone call, she assumed that Cody told someone in the company about it, who then called Webster. (*Id.* at 87.)

daily tasks. (*Id.* at 62, 85.) Specifically, Plaintiff claims that she was required to change oil in the trucks, do many more trailer hook-ups, and clean out the storage area more often than she had in the past. (*Id.* at 85.) According to Plaintiff "all the work the other employees did" was now assigned to her. (*Id.* at 86.) Additionally, Plaintiff testified that Webster changed her hours, scheduled her for longer days, was reluctant to give her days off that she requested, and insisted that she open and close the store for him when he wasn't there. (*Id.* at 62, 99.) Plaintiff estimated that she was assigned five or six more hours of work per week, though she admitted she was paid overtime for those hours. (*Id.* at 99.) She also claimed that she was left doing Webster's job and that he came to work less often. (*Id.* at 100.)

Plaintiff's cousin, Vivian Shegog, corroborated Plaintiff's assertion that she was given different tasks, but Shegog testified that she also was made to do some of those tasks along with Plaintiff. (Shegog Dep., at 119.)[6] For example, Shegog recalled that after a conversation in which McDermott told Webster about Plaintiff's complaint, Webster required both Plaintiff and Shegog to hand wash trucks and vans and clean out storage areas. (Pl.'s 56.1 Additional Facts ¶ 58; Shegog Dep., at 119.) According to Shegog, she and Plaintiff had not previously been called on to wash the trucks because U-Haul had other people to do this work. (Shegog Dep., at 60.) Shegog also claimed

---

[6]     Both parties agree that Shegog was on a short medical leave of absence during the time of the incidents of touching, but, because she provides first hand accounts of what occurred after Plaintiff complained of the harassment, the court assumes that she was once again back at U-Haul the same week that Plaintiff called Jim Cody to complain.

that after Plaintiff made the last phone call and Chris McDermott came to speak to Webster, Webster directed Shegog and Plaintiff to drive the bigger trucks, sweep out the storage areas, and restock the back room, even though he had not previously asked them to do those things. (*Id.* at 60-61.) Instead, he generally made the male employees do such tasks as cleaning out the storage areas. (*Id.* at 118.)

U-Haul points out, however, that none of the tasks Plaintiff or Shegog described were outside of Plaintiff's job description as a customer service representative. (Def.'s 56.1 Statement ¶ 76.) Webster contends that the real reason for assigning Plaintiff additional job duties was the fact that she was no longer pregnant, not the fact of her complaints. (Webster Dep., at 272.) As he explains it, from August 1998, when Plaintiff was nine months pregnant, until three months after childbirth, she was not required to do any heavy lifting or to pick up hitches. (*Id.* at 272.) He explained, however, that by October or November of 1998, her duties were once again the same as any other U-Haul customer service representative, including assisting with the cash register, light cleanup, trailer hookup, and storage. (*Id.* at 272-73.) Thus, Webster argues that Plaintiff's job duties changed before she ever complained of harassment. (*Id.*)

Besides giving her additional tasks to perform, Plaintiff contends that Webster began verbally abusing her, threatening her in front of customers, yelling at her at work and "just being downright rude" to her. (Pl.'s Dep., at 152.) He also used profanity when talking to her, including calling her "all types of names." (*Id.* at 202.) Plaintiff explained that he mostly used the "A word" but also called her "[e]very other word in

12

the book" including "Stupid B. You slow MF. You look like S." (*Id.* at 207.) According to Plaintiff, such incidents happened frequently after she made her complaint and had not happened before she complained. (Pl.'s Dep., at 158.) She also testified that she did not see him direct these words at anyone else at U-Haul. (*Id.* at 207.) Shegog, however, claimed that Webster called both Plaintiff and Shegog "dumb asses, stupid bitches, fucking whores," though neither party has clarified whether Webster made these statements only after Plaintiff made her complaint or the entire time that both women were at U-Haul. (Shegog Dep., at 60.)

Without denying Webster's rude behavior, U-Haul points out that such behavior was doled out to others, as well as Plaintiff. For example, U-Haul points to Shegog's testimony that Webster used similar language and exhibited similar "rude" behavior with other employees. (Def.'s 56.1 Statement ¶ 78.) In addition, Torino Terry, Plaintiffs' boyfriend and co-worker, testified that Webster regularly raised his voice to all of the employees. (*Id.* ¶ 78; Terry Dep., at 96-98.)

As additional evidence of retaliation, Plaintiff points to several written reprimands that she claims she unfairly received after she complained about Webster and later filed her EEOC charge. Plaintiff notes that prior to the filing, Webster had never given her a written warning and had, in fact, given her a raise and a promotion to a full time position. (Pl.'s 56.1 Additional Facts ¶¶ 49, 50.) On March 1, 1999, six days after Plaintiff first complained to U-Haul about Webster, Webster issued a written warning notice to Plaintiff for failing to make the closing bank deposit for February 28, 1999. (Def.'s 56.1 Statement ¶ 79; Pl.'s 56.1 Additional Facts ¶ 46.) On April 6, 1999,

Plaintiff was given four more warning notices, addressing the following violations that occurred on April 4, 1999: (1) failure to work to the end of her scheduled work shift of 5:30 pm, effectively closing the U-Haul center early that day; (2) taking a U-Haul vehicle for personal use without prior authorization and leaving the U-Haul facility understaffed while she used the vehicle; (3) using the vehicle overnight, after hours; and (4) failing to maintain a business atmosphere by allowing a non-employee onto the premise to disrupt the facility's operations. (Def.'s 56.1 Statement ¶¶ 80, 81.)

Defendant contends that, though Plaintiff began to receive written reprimands after she complained of harassment, she herself admitted that she deserved some of the reprimands. For example, Plaintiff admitted that she failed to make the bank deposit. (Pl.'s Dep., at 128-129.) She explained, however, that she did not do so because she did not have a car at the time. (*Id.*) Plaintiff also explained that she did not deserve all of the reprimands because it was Julie Solis, not Plaintiff, who took the van. (Pl.'s 56.1 Response ¶ 81.) She admits that she went with Solis in the van to get lunch but claims that Solis had permission to take the van out. (Pl.'s Dep., at 131, 132.) Plaintiff also denies that she left early or that she had a visitor on the premises. (Pl.'s 56.1 Response ¶ 81.) She asserts that her visitor, Torino Terry (who by this time had been terminated from his employment at U-Haul) remained outside of the store and only came to bring her lunch. (*Id.* at 139.)

Defendant claims, however, that these were not the first reprimands Plaintiff ever received. To the contrary, U-Haul contends that Plaintiff was orally reprimanded by Webster prior to her complaint for locking a U-Haul customer in a rental storage

area and for throwing merchandise at a customer in response to the customer's complaint. (Def.'s 56.1 Statement ¶ 82, citing Webster Dep., at 273-76.) Webster admits, however, that he did not give Plaintiff a written warning notice at that time. (*Id.*) Nor was Webster sure whether or not he contacted U-Haul's Human Resources Department regarding those incidents. (*Id.*) Plaintiff denies that she was reprimanded for those acts. (Pl.'s 561. Response ¶ 82; Webster Dep., 276.)

Plaintiff also alleges that, as part of his retaliation, Webster accused her of stealing different items and relayed these accusations to McLaughlin. (Pl.'s 56.1 Additional Facts ¶ 61.) Specifically, Plaintiff alleges that on April 30, 1999, Webster told McLaughlin that Plaintiff had stolen furniture from a customer's storage locker, on April 28, 1999, Webster accused Plaintiff of stealing some uniforms, and on May 3, 1999, Webster told McLaughlin that Plaintiff planned to break into the storage lockers with a former employee. (*Id.* ¶¶ 61, 62, 113.) Plaintiff also alleges that, at some point in April 1999, Webster told a customer named Omateg Barnes that Plaintiff had stolen something from Barnes' storage space. (Pl.'s Dep., at 185.) As a result, the police came and placed Plaintiff in a holding cell for almost three hours. (*Id.*) Plaintiff denied that she ever stole anything from U-Haul besides some ink pens and paper. (*Id.* at 194-95.)

For his part, Webster denies that he ever accused Plaintiff of theft. According to Webster, one of the storage customers had a number of pieces of furniture stolen from her storage space. It was the customer who suspected Plaintiff was somehow involved in the theft, (Def.'s 56.1 Response ¶ 61; Webster Dep., at 193-199), resulting in Plaintiff's being detained by the police for that incident. (Pl.'s 56.1 Additional Facts ¶¶

120-121.)

Sometime in April, close in time to when Plaintiff filed her EEOC charge, she spoke to Chris McDermott and told him that Webster was giving her extra jobs, scheduling her more hours, and treating others more favorably. (Pl.'s Dep., at 106.) According to Plaintiff, McDermott did nothing to change that treatment. (*Id.* at 107) Plaintiff therefore decided to leave her job in late May. (Pl.'s 56.1 Statement Additional Facts ¶ 40; Karen Martinez Dep., at 57; Pl.'s Dep., at 109-110.)

### E.    Plaintiff's Defamation Claim

After Plaintiff left U-Haul, she applied for work at four different places: St. James Hospital, Rent-A-Center, Ingalls Memorial Hospital and one other place whose name she could not recall. (Pl.'s Dep., at 16.)  Plaintiff believes the reason she was not hired was that Webster did not recommend her to these employers and told them that she was a thief. (*Id.* at 28.)  To support her claim that Webster defamed her to these employers, Plaintiff testified that her cousin, Vivian Shegog, contacted a woman named Maria who had interviewed Plaintiff for the position at Ingalls Hospital. (*Id.* at 27.)[7] According to Plaintiff, Maria told Shegog that she did not hire Plaintiff because Webster had told her that Plaintiff was a thief. (*Id.* at 28.)  Plaintiff claims she never spoke to Maria herself, but got this information solely from Shegog. (*Id.* at 28-29.)  In addition, Plaintiff is certain that Webster told Rent-A-Center she was a thief because she "pretty much had [a] foot in the door," but then she wasn't hired. (*Id.* at 155-156.)

---

[7]    Neither Plaintiff nor Shegog could recall Maria's last name.

Shegog testified, however, that she never called Ingalls Hospital for Plaintiff. (Def.'s 56.1 Statement ¶ 88; Shegog Dep., at 75.) Instead, Shegog testified that Plaintiff was the one who was told by a potential employer that Webster had called Plaintiff a thief. (Shegog Dep., at 76.) Webster himself denies that he ever told any of Plaintiff's prospective employers that she was a thief and Plaintiff has offered no testimony from anyone at Ingalls Memorial Hospital or any other potential employer. (Def.'s 56.1 Statement ¶ 90.) Finally, though Plaintiff claims that Webster defamed her to several potential employers, she admitted that she did not know whether anyone at St. James Hospital ever communicated with Webster in connection with her application, nor could she say whether anyone at Rent-A-Center had ever contacted Webster. (Pl.'s Dep., at 18-19.)

## DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Wade v. Lerner New York*, 243 F.3d 319, 321 (7th Cir. 2001). In determining whether any genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000)(citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986)). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)(citing *Anderson*, 477 U.S. at 248).

### B.   Motion For Leave to File Under Seal

As an initial matter, the court must rule on Defendant U-Haul's motion for leave to file certain documents under seal. U-Haul has requested leave to file portions of the deposition testimony of Defendant Webster, Christopher McDermott and Patrick McLaughlin as well as U-Haul's memorandum in support of summary judgment and its 56.1 statement of fact under seal. As U-Haul explains, these documents contain information that is "private to certain employees and former employees of U-Haul, including information regarding the allegations in this sexual harassment case, and other private matters" and also contain "information that is proprietary, non-public business information of [D]efendant U-Haul, including confidential policy and procedure documents and other business information." (U-Haul's Motion for Leave to File Certain Summary Judgment Papers Under Seal *Instanter* ¶ 3.) U-Haul contends that disclosing this information "would likely have the effect of revealing otherwise private matters or otherwise causing substantial harm to U-Haul and/or its current and former employees." (*Id.*)

No doubt every party involved in a sexual harassment suit would, if given the chance, prefer to keep many of the details underlying the suit from the public. U-Haul has presented no specific justifications, however, for filing an entire memorandum and 56.1 statement of facts under seal, nor does this court see any justifications for so doing.

In Illinois, the party claiming confidential protection of certain documents bears the burden of showing: (1) a trade secret or confidential business information; and (2) good cause. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944-45 (7th Cir. 1999); *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 300 (N.D. Ill. 1993). It is not enough for U-Haul to insist that current and former employees would prefer these matters remain private. Such conclusory statements that disclosure will result in harm is insufficient evidence to support filing these documents under seal. *See Andrew Corp. v. Rossi*, 180 F.R.D. 338, 340, 342 (N.D. Ill. 1998)(determining whether a protective order is appropriate requires balancing the public interest in the information with the possibility that a party will be unduly burdened or oppressed by the information).

Additionally, the court is genuinely puzzled by U-Haul's argument that certain of its policies and procedures mentioned in this suit are confidential. Because U-Haul provides no specifics about which of its policies are confidential, the court is left to wonder why U-Haul would be concerned about revealing its well established (and apparently effective) sexual harassment policy. U-Haul's attempt to keep its investigation of the sexual harassment policy confidential is also baffling in light of the evidence that U-Haul handled that investigation with deliberate speed and thoroughness. Because U-Haul has been unable to provide specific reasons that any particular information involved in this case must be kept confidential, its motion for leave to file certain documents under seal is denied. The court now turns to the merits of Defendant's summary judgment motion.

19

## C.  Sexual Harassment

### 1.  Defendant Webster's Conduct

Sexual harassment is actionable under Title VII only if "it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Clark County Sch. Dist. v. Breeden*, 121 S.Ct. 1508, 1509 (2001)(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)(quotation marks omitted); *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000). The test for determining whether harassment is actionable is both subjective and objective; the plaintiff must establish both that a reasonable person would find the harassment created an abusive working environment and that she, in fact, did perceive it to be so. *Gentry v. Export Packaging Co.*, 238 F.3d 842 (7th Cir. 2001). As the Supreme Court has explained, in making this determination, "[w]orkplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County*, 121 S.Ct. at 1510 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)(quotation marks omitted). To be actionable "the conduct at issue must 'ha[ve] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.'" *Murray v. Chicago Transit Auth.*, No. 99-3774, __ F.3d __, 2001 WL

493433, at *6 (7th Cir. May 10, 2001), citing *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 397 (7th Cir. 1999)(quoting *Saxton v. American Tel. & Tel., Co.*, 10 F.3d 526, 533 (7th Cir. 1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County*, 121 S.Ct. at 1510 (citations and quotation marks omitted).

In the instant case, Plaintiff's allegations of harassment center around the two occasions where Defendant Webster came up behind her and rubbed her thighs; the first time, outside of the pockets and for about 30 seconds until she told him to stop, the second time, reaching inside of her pockets and rubbing her thighs for about 5 seconds until she hit him in the stomach. Webster claims that he never touched Plaintiff's person, but instead, only took keys out of her pockets after she gave him permission to do so. Taking the facts in the light most favorable to the Plaintiff, however, the court assumes that these touches were inappropriate and unwelcome. Along with the two incidents of improper touching, Plaintiff alleges that Webster asked her out on dates "just about every day" and acted flirtatiously towards her. Additionally, Plaintiff's cousin, Vivian Shegog, who worked along side Plaintiff and Webster, testified to a series of harassing incidents to which Webster subjected Plaintiff. These included moving close to Plaintiff and "patting her up," going out of his way to brush up against her, staring at her, making comments as she bent over, and touching her.

Even taking all of these incidents together, however, they do not establish harassment that is severe and pervasive enough to be actionable. The two incidents of

touching may have been inappropriate, but isolated instances of unwanted sexual advances are not enough to create a hostile work environment. *See, e.g., Saxton v. American Telephone and Telegraph Co.*, 10 F.3d 526, 534 (7th Cir. 1993). In *Saxton*, Plaintiff's supervisor, Jerome Richardson, placed his hand on her leg above the knee several times, rubbed his hand along her upper thigh and grabbed her and kissed her for two to three seconds while the two were out together. *Id.* at 528. After plaintiff told him to stop, he did so, but three weeks later after the two had lunch together he came at her from behind some bushes and attempted to grab her. *Id.* The Seventh Circuit found that "although Richardson's conduct was undoubtedly inappropriate, it was not so severe or pervasive as to create an objectively hostile work environment." *Id.* at 534. The court recognized that "any employee in Saxton's position might have experienced significant discomfort and distress as the result of her supervisor's uninvited and unwelcome advances," but explained that the limited nature of the incidents kept such behavior from rising to the level of pervasive harassment, even where there were "two instances of sexual misconduct rather than one." *Id.*

Similarly, Webster touched Plaintiff on only two occasions that Plaintiff could recall and both incidents were limited in nature. In Plaintiff's own version, the first incident lasted only about 30 seconds while the second incident lasted about 5 seconds. Webster stopped touching her the moment she told him to and never touched her again once he received a written warning from U-Haul against such behavior. Thus, taking Plaintiff's version of the incidents as true, Webster's behavior was inappropriate and

offensive but neither severe nor pervasive. *See, e.g. Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 708 (7th Cir. 1995)(offensive remarks and two incidents of physical contact by supervisor including grabbing plaintiff's buttocks found to be nonactionable harassment).

Nor does Webster's occasional flirting in the workplace change the analysis. Plaintiff explained the flirting only "sometimes" bothered her. In *Robinson v. Truman College,* No. 97 C 896, 1999 WL 33887, at *2 (N.D. Ill. Jan. 19, 1999), plaintiff claimed that her supervisor referred to her as "honey," "sweetie," or "baby"; told her he couldn't believe they hadn't slept together yet and told her that if he wasn't married he would marry her; made frequent telephone calls to her for work-related matters but spoke to her in a romantic tone of voice; and touched her buttocks on two separate occasions. The court found that the remarks, "while unquestionably obnoxious and boorish," were not "sufficiently severe or pervasive to have altered the conditions of Robinson's employment or to have made her workplace hellish." *Id.* at *5. The court also found that the two "seemingly isolated" instances of touching "occurring approximately one month apart," though inappropriate, did not rise to the level of actionable conduct. *Id.*; *see also Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir. 1993)(no actionable harassment where supervisor asked plaintiff out for dates, called her a "dumb blond," placed his hand on her shoulder several times, placed "I love you" signs in her work area and attempted to kiss her in a bar and in the office).

Finally, Plaintiff's claim that Webster asked her out on dates on a "daily basis"

and Shegog's testimony about further harassing acts to which Webster subjected Plaintiff do not make this claim an actionable one. A supervisor is ill-advised to ask his subordinate out on a daily basis. For purposes of Title VII, however, a Plaintiff must show not only that "a reasonable plaintiff would find [her environment] offensive," but also that "the plaintiff actually perceived it as such." *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 668 (7th Cir. 2001); *Hostetler v. Quality Dining Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). Plaintiff testified that, though Defendant Webster asked her out on dates frequently, these requests did not bother her and she did not consider them to be sexual harassment. Because she herself did not find this behavior offensive, the court need not consider what others may have thought about such behavior. Similarly, Shegog's testimony concerning all kinds of offensive conduct that Plaintiff was allegedly subjected to does not meet the subjective component of the test. Plaintiff herself testified that the two incidents of touching and Webster's flirting were the only acts of harassment she perceived. Where Plaintiff herself was unaware of Webster's additional alleged misconduct, she cannot be said to have suffered from its effects. Thus, Plaintiff has not established an actionable harassment claim and summary judgment is properly granted to U-Haul on this claim.

### 2. Employer's Liability

Even assuming that Plaintiff had established an actionable harassment claim, Defendant U-Haul could not be held vicariously liable for Webster's harassment in this case. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively

higher) authority over the employee. *Murray v. Chicago Transit Authority*, No. 99-3774, __ F.3d__, 2001 WL 493433, at \*4 (7th Cir. May 10, 2001)(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).   If the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment, the employer will always be vicariously liable for the supervisor's action. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08.  When, however, no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.  *Id.*  The employer must then show:  (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage of available preventive or corrective measures. *Id.*

Plaintiff has offered evidence that she suffered some tangible employment action as a result of her complaint of harassment, as discussed below.  There is no evidence, however, that she suffered any adverse action as a result of the alleged harassment. Indeed, Plaintiff herself admits that during the time of the alleged harassment, Defendant Webster gave her a raise and promoted her to a full time employee.  Thus, U-Haul is entitled to assert an affirmative defense.

It is undisputed that U-Haul had a detailed sexual harassment policy in place before Plaintiff began working there.  This policy was included in a publication given to Plaintiff when she was hired and, in fact, it was this publication that Plaintiff used

to ultimately find the 800 number she called to complain about Webster. In response to Plaintiff's call, U-Haul sent its marketing company president Chris McDermott to the Park Forest facility to investigate Plaintiff's complaint two days later. Plaintiff complains that McDermott did not handle the investigation according to company policy and conducted a poor investigation in a number of ways, including failing to talk to the Plaintiff first, talking to a witness without telling the witness to keep the matter confidential, and failing to talk to certain witnesses such as Plaintiff's cousin Vivian Shegog. It is undisputed, however, that after the investigation, McDermott gave Webster a written warning stating that any future inappropriate comments or actions would subject him to immediate termination. Webster then reviewed and signed that warning. It is also undisputed that Webster never touched Plaintiff again after U-Haul's actions. Thus, U-Haul has clearly met the first prong of the affirmative defense.

To support the second prong, U-Haul points out that Plaintiff did not report that Webster had touched her until the second touching incident occurred. U-Haul notes that Plaintiff waited more than a month after the first alleged touching, more than a week after the second alleged touching, and through six months of Webster asking Plaintiff out before reporting the incidents. (Def.'s 56.1 Statement ¶ 44.) The court is hesitant to characterize as "unreasonable" a plaintiff who tries to resolve an inappropriate incident herself (by telling the harasser never to touch her again) and waits until a repeated incident occurs before reporting the harassment. Nevertheless, U-Haul could not be expected to remedy the first incident of touching or the alleged flirting until Plaintiff's phone call at the end of February. Thus, even if Plaintiff had

stated an actionable harassment claim, U-Haul would not be vicariously liable for Webster's behavior.

## D.    Retaliation

Plaintiff next claims that Webster retaliated against her for complaining to U-Haul about him and for filing her EEOC claim. Title VII makes it unlawful "for an employer to discriminate against any of [its] employees . . . because he [or she] has opposed any practice made an unlawful employment practice" by Title VII. *Murray v. Chicago Transit Authority*, 2001 WL 493433, at *7 (citing 42 U.S.C. 2000e-3(a)). To state a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action. *Sweeney v. West*, 149 F.3d 550, 555 (7th Cir. 1998).

Plaintiff bases her retaliation claim on the fact that after she complained of the perceived harassment: (1) she received a number of written reprimands whereas before this time she had never received any reprimand; (2) Webster accused her of stealing; (3) Webster made her work longer hours and gave her additional tasks that she had never been asked to perform before; and (4) Webster became verbally abusive to her. Defendant U-Haul contends that Plaintiff has not established a prima facie case of retaliation because none of these actions constitute materially adverse employment action and, even if they were adverse actions, Plaintiff cannot establish the required causal link between her protected expression and the adverse action, nor can she show that Defendant's proffered reasons for the actions were a pretext for retaliation.

27

Adverse job action is not limited "solely to loss or reduction of pay or monetary benefits" but can encompass "other forms of adversity as well." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). A materially adverse change in the terms and conditions of employment, however, must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132, 135 (7th Cir. 1993). Such a change might be indicated "by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.*; *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000).

Plaintiff contends that she received a number of written reprimands shortly after she complained about Webster's harassing treatment, but she admits that those reprimands did not lead to any demotions, reduced pay or other tangible consequences. The Seventh Circuit has already concluded that "negative performance evaluations, standing alone, cannot constitute an adverse employment action," where those evaluations were not linked to any tangible job consequences. *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)(citing *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir. 1996) ("There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action."). In addition, even if such actions could be seen as adverse, Plaintiff cannot show that U-Haul's proffered reasons for giving the reprimands were pretext for retaliation. In fact, Plaintiff admits

that some of the reprimands were to a degree accurate: she admits she did not make a bank deposit when she was supposed to, she had a visitor come to the store, and she went out in a company van. Plaintiff has reasonable explanations for all of her actions, but such explanations are not relevant to the inquiry at hand: whether the employer's reasons for a decision were honest, not whether they were correct. *Sweeney*, 149 F.3d at 557. Nor has Plaintiff offered evidence that other workers guilty of similar misconduct were not subject to discipline. Thus, the written reprimands do not support Plaintiff's retaliation claim.

Plaintiff also complains that Webster accused her of theft and let U-Haul management know about these accusations. As with the written reprimands, however, Plaintiff does not allege that she suffered any adverse employment actions due to these accusations. Webster never attempted to fire Plaintiff for theft nor did U-Haul, she was never suspended pending any investigation, and she never lost any pay with regard to these accusations. Even assuming Webster made such accusations, therefore, they do not constitute adverse employment action.

Finally, Plaintiff complains that she was assigned additional tasks immediately after she complained about Webster's harassment and, during this time, Webster became verbally abusive to her. U-Haul argues that, even if Plaintiff's testimony is believed, Webster was merely requiring Plaintiff to perform tasks already in her job description. Defendants note, further, that Plaintiff had greater responsibility than her co-workers because she was the only full time employee at the time and was second in command to Webster. (Def.'s 56.1 Statement ¶¶ 36, 76.) Plaintiff admits that the

additional tasks she was assigned were always part of the customer service representative's job description, and that she received overtime pay for the extra hours she worked. She insists, however, that Webster did not assign her those undesirable tasks until after she voiced a complaint. (Def.'s 56.1 Statement ¶ 77; Pl.'s 56.1 Response ¶ 76.)

The Seventh Circuit has found that a change in an employee's assigned work tasks may constitute material adverse employment action even when those tasks are still within the scope of her job description. For example, in *Dahm v. Flynn*, 60 F.3d 253, 254 (7th Cir. 1995), plaintiff, a former employee of the Wisconsin State Lottery, claimed that her employer retaliated against her after she testified about problems in her department in front of the Joint Audit Committee of the Wisconsin legislature. According to Dahm, after she gave this testimony, her job duties began to change in a way that she perceived as a "de-skilling" of her position. *Id.* at 255. Such changes included, among other things: (1) certain tasks that formerly were within her purview were delegated to her assistants; (2) she was given increased responsibility for processing requests, a less skilled job than she usually performed; and (3) she was required to begin documenting her daily telephone calls and her meetings with employees. *Id.* Despite evidence that these shifting responsibilities were "within the confines of her job description," the Seventh Circuit rejected the notion that such changes could not therefore be considered a materially adverse change in the terms and conditions of employment. *Id.* at 257. Instead, the court found that such change in responsibilities from intellectually stimulating activities to routine work could rise to

the level of an adverse employment action, "even if the time required to perform the duties remains constant." *Id.*

Plaintiff claims that after she complained of the harassing behavior, she was not only given additional work, but also made to perform more unpleasant tasks that she had not previously been required to perform, certain of which were normally left to the male employees. For obvious reasons, U-Haul insists that everyone, male and female, performed all of the tasks as a customer service representative. Plaintiff has, however, presented enough evidence to call this practice into question. If a trier of fact were to believe Plaintiff and her cousin Shegog that there were certain, more menial tasks that she was not required to perform until after she complained about Webster's harassment, this change in job assignments would be enough for Plaintiff to establish her claim of retaliation. *See, e.g., Gaser v. Levitt*, No. 98 C 210, 1998 WL 684207, at *4 (N.D. Ill. Sept. 23, 1998)(where plaintiff alleged that his employer "significantly decreased the quality, if not the quantity, of his work assignments," by, among other things, assigning him "only routine tasks," the alleged change in plaintiff's job responsibilities constituted an adverse employment action); *see also Johnson v. Chicago Bd. of Ed.*, No. 00 C 1800, 2000 WL 1785311, at *5 (N.D. Ill. Dec. 5, 2000)(plaintiff had alleged sufficient facts to show an adverse employment action where she was transferred to another shift that she did not want and was allegedly given an increased work load).

Nor is the court convinced of U-Haul's assertion that Plaintiff's tasks changed after the birth of her child, not as a result of her complaint. Plaintiff admits that from

the time she was nine months pregnant, in August of 1998, until six weeks after giving birth, she was not required to do certain tasks at U-Haul, but both Webster and Plaintiff say she was already performing all of her tasks by the end of 1998. Thus, by testifying that she did not have to do some of these assignments and did not suffer verbal abuse until after she filed her complaint, Plaintiff establishes a dispute concerning the requisite causal connection between the adverse action and the retaliation. *See, e.g., Sweeney v. West,* 149 F.3d 550, 557 (7th Cir. 1998) (A "telling temporal sequence" can establish the required nexus between an employee's protected expression and any adverse employment action, as long as the action follows soon after the protected expression: "One day might do it, so too might one week.")

Although the court concluded that Plaintiff's retaliation claim may go forward, a note of caution is in order. The court has granted summary judgment on the remainder of Plaintiff's claims, and she has not alleged constructive discharge. Thus, any damages Plaintiff might receive would be limited to compensation for the harm she suffered during the short period of time (from the end of February 1999 until the end of May 1999) during which Plaintiff allegedly experienced retaliation.

## E.    Defamation

Defamation is "the publication of anything injurious to the good name or reputation of another, or which tends to bring him into disrepute." *Howse v. Northwestern Memorial Hospital,* No. 98 C 4488, 2000 WL 764952, at *8 (N.D. Ill. 2000). Under Illinois law, words that impute the commission of a criminal offense are considered defamatory *per se. Chisolm v. Foothill Capital Corp.,* 3 F. Supp. 2d 925, 938

(N.D. Ill. 1998)(quoting *Beasley v. St. Mary's Hosp.*, 200 Ill. App. 3d 1024, 1033, 558 N.E.2d 677, 683 (5th Dist. 1990)). To prove a claim of defamation, Plaintiff must establish that: (1) Defendant made a false statement of fact concerning her; (2) there was an unprivileged publication of the defamatory statement to a third party by Defendant; and (3) Plaintiff was, in fact, damaged by that publication. *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424, 698 N.E.2d 674, 678 (1st Dist. 1998); *see also Chisolm*, 3 F. Supp. 2d at 938; *Pandya v. Hoerchler*, 256 Ill. App. 3d 669, 673, 628 N.E.2d 1040, 1043 (1st Dist. 1993).

Plaintiff claims that after she left U-Haul, Webster uttered defamatory statements to potential employers, including St. James Hospital, Ingalls Hospital, and Rent-A-Center. Specifically, Plaintiff claims that when potential employers called Webster for a reference, he falsely told them that Plaintiff was a thief. [8] Plaintiff bases her entire claim of defamation on the following facts: according to Plaintiff, her cousin, Vivian Shegog, called a woman, Maria, from Ingalls Hospital who told Shegog that Plaintiff was not going to be hired because Webster said that Plaintiff was a thief. Surprisingly enough, Shegog actually denies ever having had such a conversation, and instead testified that it was Plaintiff who called Maria and then told Shegog what Maria said. Other than this contradictory evidence, Plaintiff supports her claim by offering only her own conviction that, with Rent-A-Center, another potential employer,

---

[8] Because Webster denied ever calling Plaintiff a thief and denied that he believed she stole anything from U-Haul, truth cannot be a defense to this defamation claim.

she "pretty much had [a] foot in the door" but was not hired. (Pl.'s Dep., at 155-56.)[9]

Both U-Haul and Webster contend that Plaintiff has failed to provide any admissible evidence to support her defamation claim. The court agrees. Leaving aside the glaring problem that Plaintiff and Shegog cannot agree on who allegedly called Ingalls Hospital and, assuming that Shegog did call the hospital as Plaintiff states, any information that Maria provided Shegog about what Webster said is, nonetheless, inadmissible hearsay. To be sure, the testimony of a witness that Webster told him or her that Plaintiff was a thief would not be hearsay because it would be offered to prove that Webster made the statement, not that the statement was true. *See Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 377-78 (7th Cir. 1996)(in a defamation case, testimony of a witness that an individual defamed the plaintiff is never hearsay where it is not being brought in for the truth of the matter, but, rather, merely to prove the statement was made); *Chisolm*, 3 F. Supp. 3d at 939 (same). Thus, Maria could properly testify that she heard Webster call Plaintiff a thief. Absent Maria's testimony, however, her alleged conversation with Shegog is inadmissible hearsay, as is Shegog's conversation reporting the whole incident to Plaintiff. *See, e.g., Bularz*, 93 F.3d at 377-

---

[9] Shegog also testifies that at one point she called Webster, pretending be a prospective employer checking Plaintiff's references. (Shegog Dep., at 87-88.) According to Shegog, Webster responded that Plaintiff was a thief and had stolen money and products from the store and property from customers. (*Id.*, at 87-88.) Perhaps because she recognizes that this information is unreliable, Plaintiff does not mention this incident anywhere in her brief or in her lengthy statement of facts. In any event, because Plaintiff could not have been damaged by Webster's statements to her own cousin, the testimony, even if true, would not advance Plaintiff's defamation claim.

78 (where witness testified that a sales manager told her that another individual told him that yet a fourth individual defamed the plaintiffs, such testimony constituted double hearsay). Because Plaintiff offers no way around this double hearsay, nor does she offer the testimony of even one employer who allegedly heard Webster call Plaintiff a thief, Plaintiff's defamation claim cannot survive summary judgment.

Plaintiff's blanket assertion that her inability to get a position at Rent-A-Center resulted from defamation is a nonstarter. There is no evidence that Webster actually spoke to any individual at Rent-A-Center. Plaintiff admits that she did not speak to a single potential employer to determine whether anyone called Webster for a recommendation, and Webster denied telling any potential employer that she was a thief. To prevail on a claim of defamation, mere speculation concerning the defendant's words is simply not enough; Plaintiff must affirmatively establish publication of the defamatory statements. *See, e.g. Gibson v. Phillip Morris, Inc.*, 292 Ill. App. 3d 267, 275, 685 N.E.2d 638, 644 (5th Dist. 1997)(publication is an essential element of a cause of action for defamation). Because Plaintiff has failed to present admissible evidence to establish that any defamation occurred, the court need not address the problematic inconsistencies between Plaintiff's and Shegog's testimony, nor need it address whether any such information Webster gave future employers was protected by a conditional privilege. Summary judgment is properly granted to Defendants on this count.

## CONCLUSION

For the foregoing reasons, Defendant U-Haul's Motion for summary judgment (Doc. No. 77) is granted as to Plaintiff's sexual harassment count and defamation count and denied as to Plaintiff's retaliation claim. Defendant U-Haul's motion to file certain summary judgment papers under seal (Doc. Nos. 79, 103) is denied. Defendant Arlester Webster's motion for summary judgment on Plaintiff's defamation count (Doc. No. 75) is also granted. Additionally, because Defendant Webster has not moved for summary judgment with respect to Plaintiff's assault and battery claim against him, that claim survives this opinion. Because all other federal claims against Webster are dismissed, however, and because the state law assault and battery claim can be severed from Plaintiff's retaliation action, that claim is dismissed without prejudice to proceeding on that claim in state court.

ENTER:

Dated: June 5, 2001

REBECCA R. PALLMEYER
United States District Judge